# ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MARCIA ROBINSON    pro-se _____

Plaintiff _____

_____

           against

2016 APR 14   PM 2: 55
U.S. DISTRICT COURT
S.D. OF N.Y.W.P.
FILED

**COMPLAINT**

Jury Trial   Yes   No

**Defendants**

Former President Pastor Trevor Baker _____

Orra Wood _____

Jane Doe _____

John Doe _____

Former Pastor Allen _____

Fitzroy Henry _____

Former President Herbert Thompson _____

John Doe _____

Former President Jeremiah Duncombe _____

Jane Doe _____

Former President Leonard Johnson _____

Jane Doe _____

John Doe _____

Everton Ennis _____

Pastor C. Melvin Lewis _____

President Daniel Honore _____

Pastor Brown _____

Jane Doe _____

Pastror Robert Presley _____

Mr. Presley _____

Teddy Thordan _____

# 16 CV 02797

## JUDGE ROMAN

Former Vincent PeterKing

Mrs. Mighty

Former Pastor Law

President Pastor G. Earl Knight

John Doe

Jane Doe

Mark Gordon

President Pastor Isreal Leito

Pastor Dudley Dixon

Jane Doe

Mrs. Gunter

John Doe

Marisol Velez

Jane Doe

Jane Doe

Jane Doe

Jane Doe

Jane Doe

Jane Doe

Jane Doe

John doe

John Doe

John Doe

John Doe

Jane Doe

John Doe

Jane Doe

John Doe

Jane Doe

Defendant  No. 1 Name Former President Trevor Baker

                    Street Address 115-50 Merrick Blvd Jamaica

                    County, City Queens, New York

                    State & Zip Code New York 11431

                    Telephone Number (718)291-8006

Defendant No. 2   Name Orra Wood

                    Street Address 169 B Greeves Rd

                    County, City  New Hampton, New York

                    State & Zip  New York, 10958

                    Telephone Number

Defendant  No. 3   Name  Jane Doe

                    Street Address  115-50 Merrick Blvd Jamaica

                    County, City Queens, New York

                    State & Zip  New York 11434

                    Telephone Number (718)291-8006

Defendant No. 4   Name  John Doe

                    Street Address 115-50 Merrick Blvd Jamaica

                    County, City Queens New York

                    State & Zip Code New York11434

                    Telephone Number (718)-291-8006

Defendant No. 5    Name Former Pastor Allen

                    Street Address 58 Brunswick Ave, Spanishtown

                    County, City  Jamaica W.I.

                    Telephone Number (876)984-2044/984-5576x7

Defendant No. 6    Name Fitzroy Henry

                    Street Address 58 Brunswick Ave, Spanishtown

County, City Jamaica W.I.

Telephone Number (876)984-2044/984-5576x7

Defendant No. 7    Name Former President Herbert Thompson

Street Address Manchester Road Mandivelle

County, City Jamaica W.I.

Telephone Number (876)984-2044/984-5576x7

Defendant No.8    Name John Doe

Street Address Manchester Road Mandivelle

County, City Jamaica W.I.

Telephone Number (876)984-2044/984-5576x7

Defendant No. 9    Name  Former President Jeremiah Duncombe

Street Address P.O. Box N-35

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242)341-4021/341-4022

Defendant  No. 10  Name Former Jane Doe

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242)341-4021/341-4022

Defendant No. 11    Name Former President Pastor Hugh A. Roach

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242) 341-4021/341-4022

Defendant No. 12   Name  Jane Doe

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242) 341-4021/341-4022

Defendant No. 13    Name Former President Pastor Leonard Johnson

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242) 341-4021/341-4022

Defendant  No. 14    Name Jane Doe

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242) 341-4021/341-4022

Defendant No.  15    Name John Doe

Street Address P.O. Box N-356

County, City  Nassau Bahamas

State & Zip Code

Telephone Number (242)341-4021/341-4021

Defendant No.16    Name Everton Ennis

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242)341-4021/341-4021

Defendant No. 17    Name  Pastor C. Melvin Lewis

Street Address P.O. Box N-356

County, City Nassau Bahamas

State & Zip Code

Telephone Number (242)341-4021/341-4021

Defendant No. 18    Name President Daniel Honore

Street Address 115-50 Merrick Blvd

County, City Queens, New York

State & Zip Code N.Y. 11434 United States

Telephone  Number (718)291-8006

Defendant No. 19   Name Pastor Brown

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11434

Telephone Number (718) 291-8006

Defendant No. 20   Name Jane Doe

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11434

Telephone Number (718) 291-8006

Defendant  No. 21   Name Former Pastor Robert Presley

Street Address 115-50 Merrick Blvd

County, City  Queens New York

State & Zip Code New York 11434

Telephone Number (718)291-8006

Defendant  No. 22   Name Mr. Presley

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11434

Telephone Number (718) 291-8006

Defendant  No. 23   Name Teddy Thordan

Street Address  115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11434

Telephone Number (718) 291-8006

Defendant  No. 24   Name Former Principal Vincent Peterking

Street Address Northern Caribbean University

County, City Manchester, Road Mandeville

State & Zip Code

Telephone Number (876)962-2204

Defendant No. 25    Name  Mrs. Mighty

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11431

Telephone Number (718)291-8006

Defendant No. 26    Name Pastor Law

Street address 115-50 Merrick Blvd

County, City Queens New York

State, & Zip Code New York 11431

Telephone Number (718)291-8006

Defendant No. 27    Name President Pastor G. Earl Knight

Street Address 7 Shelter Rock Road

County, City Manhasset New York

State, & Zip Code New York 11030-3222

Telephone Number (516) 627-9350

Defendant No. 28    Name John Doe

Street Address 7 Shelter Rock Road

County, & Zip Code New York 11030-3222

Telephone Number (516) 627-9350

Defendant No. 29    Name Jane Doe

Street Address 7 Shelter Rock Road

County, City New York 11030-3222

State, & Zip Code New York 11030-3222

Telephone Number (516)627-9350

Defendant No. 30    Name Jane Doe

Street Address 7 Shelter Rock Road

County, City Manhasset New York

State, & Zip Code New York 11030-3222

Telephone Number (516)627-9350

Defendant No. 31    Name Mark Gordon

Street Address 7 Shelter Rock Road

County, City Manhasset New York

State, & Zip Code New York 11030-3222

Telephone Number (516)627-9350

Defendant No. 32    Name President Pastor Isreal Leito

Street Address 12501 Old Columbia Pike

County, City  Silver Spring, Maryland

State, & Zip Code Maryland, 20904 United States of  America

Telephone Number (301)680-6000

Defendant No. 33    Name Pastor Dudley Dixon

Street Address 58 Brunswick Ave, Spanish Town

County, City Jamaica, West Indies

State & Zip Code

Telephone Number (876)984-2044/984-5576x7

Defendant No. 34    Name Jane Doe

Street Address 58 Brunswick Ave, Spanish Town

State & Zip Code Jamaica, West Indies

Telephone Number (876)984-2044/984-5576x7

Defendant No. 35    Name Mrs.Gunter

Street Address 58 Brunswick Ave, Spanish Town

State & Zip Code Jamaica, West Indies

Telephone Number (876)984-2044/984-5576x7

Defendant No. 36    Name John Doe

Street Address 26 Branford Street

County, City Hartford Connecticut

State & Zip Code Connecticut 06112

Telephone Number

Defendant No. 37     Name Marisol Velez

Street Address P.O. Box 9005

County, City  Mt. Vernon, New York

State, & Zip Code  New York 10552

Telephone Number(914)668-0195/860-459-3181

Defendant No. 38     Name Jane Doe

Street Address P.O. Box 9005

County, City Mt. Vernon, New York

State & Zip Code New York 10552

Telephone Number (914)668-0195/860-459-3181

Defendant  No. 39     Name  Jane Doe

Street Address 26 Brandford Street

County, City  Hartford Connecticut

State & Zip Code Connecticut 06112

Telephone Number (860) 665-7901

Defendant No. 40     Name Jane Doe

Street Address 1 Pine Street

County, City Dutches, Poughkeepsie N.Y.

State & Zip Code 12601

Telephone Number (845)454-8500

Defendant  No. 41     Name Jane Doe

Street Name 135 Broad Street

County, City Hartford, Connecticut

State & Zip Code Hartford Ct, 06105

Telephone Number (860)525-1163

Defendant No. 42     Name Jane Doe

Street Address 3 John H. Stewart Street

County, City Newington Connecticut

State & Zip  Code  Connecticut, 06111

Telephone Number (860)665-7901

Defendant No.43          Name Jane Doe

Street Address 3 John H. Stewart Street

County, City Newington Connecticut

State & Zip Code Connecticut, 06111

Telephone Number (860)665-7901

Defendant No. 44          Name Jane Doe

Street Address 3 John H. Stewart Street

County, City Newington Connecticut

State & Zip Code Connecticut, 0611

Telephone Number (860) 655-7901

Defendant No. 45          Name John Doe

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11434

Telephone Number (718)291-8006

Defendant No. 46          Name John Doe

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11431

Telephone Number (718) 291-8006

Name John Doe

Defendant No. 47          Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11431

Telephone Number (718)291-8006

Defendant No. 48          Name Jane Doe

County, City Queens New York

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York 11431

Telephone Number (718)291-8006

Defendant No. 49             Name John Doe

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip Code New York

Telephone Number (718)291-8006

Defendant No. 50             Name Jane Doe

Street Address 115-50 Merrick Blvd

County, City Queens New York

State & Zip code New York 11431

Telephone Number (718)291-8006

Attach

Defendant No. 1   The defendant is abusive to their powers. The defendant former President Pastor, Trevor Baker is the former President of North Eastern Conference of Adventist.  On or about 1973, the former President Pastor Trevor Baker made sexual advancement to me  at my home located in May Pen, Clarendon Jamaica West Indies. I was ten year old, when I did not comply the Former President Pastor Trevor Baker and his agents has continued to harassed me.  On or about 1996 The defendant Pastor Trevor Baker harassed the plaintiff by stopping her green card which the plaintiff was eligible for under the skilled program.  The organization  were knowledge about the defender for- mer President Pastor Trevor Baker history and failed to take proper actions against him

Defendant No. 2   On or about 2012 the plaintiff employer Orra Wood informed the plaintiff that a min- ister made threatening calls to her home stating that "he can get my throat cut off if I don't stop these things", in addition the defender former President Trevor Baker gave the plaintiff employer falsify and damaging words about the plaintiff, such as stated, "She has a thing with men" as a result the plaintiff was further abused on her by Tom Sawyer and terminated with falsify and damaging words behind the plaintiff name.  Around and about 2012 before the plaintiff was fired her employer allowed the plaintiff to make complaint to law enforcement about this situation.

Defendant No. 3   On or about 1996 Jane Doe which one of former President Pastor Trevor Baker fia- nce, harassed me at the Conference office at 115-50 Merrick Blvd. Jamaica Queens Jane Doe harassed me by stating she has children for the former President Pastor Trevor Baker and did Conference did not file for her green card.

Defendant No. 4   On or about 1999 John Doe Conference worker approached me at my home located at Merrick Blvd. Jamaica Queens.  John Doe informed the plaintiff that former President Pastor Trevor Baker wife became mentally ill and died and that the former President Pastor Trevor Baker gave John Doe this message to deliver to plaintiff.

Defendant No. 5     On or about 1985 the plaintiff niece was molested by former Pastor Allen, a friend of former President Pastor Trevor Baker, the plaintiff has tried to take actions ag-isn't this unlawful act but was further retaliated by, former President Pastor Trevor and his agents. The organizations were knowledgeable about Former Pastor Allen history and failed to take the proper actions against him. Exhibit No. 1

Defendants No. 6     The defendant Fitzroy Henry has a history. On or about 1985 to 1986 Fitzroy Henry sexually assaulted the plaintiff by forcing himself on her, this situation happened in Jamaica West Indies, the campers and Conference workers witness this crime. The organizations were knowledgeable about Fitzroy Henry history but failed to take proper actions against him.

Defendant No. 7     The defendants are abusive to their powers. On or about 1989 the defendant sexually assaulted me in my sleep. This event happened at the hostel I lived, while I attended West Indies College, located in Mandeville Jamaica W.I. Other students were involved in this situation such as 95% of the student body. was abused by the said defendant Former President Herbert Thompson. I have completed my clerical studies in office administration, and I was discriminated. The organizations were knowledgeable about the former President Herbert Thompson abusive conduct and has failed to take proper actions against him.

Defendant No. 8     The defendants are abusive to their powers.  On or about 1989 I made complaint to John Doe the   President of the West Indies College and the administrators that I was sexually assaulted by Former President Herbert Thompson no legal action was ever taken at that time. The administration failed to take proper actions.

Defendant No.  9     The defendant is abusive to their powers their powers. On or about 1989, the def.-dant hired plaintiff to work in the Bahamas Conference, the defendant agreed to compensated the plaintiff Conference benefits. On or about 1990 The defendant made sexual advancement to the plaintiff at his home in the Bahamas, when the plaintiff did not comply to the former President Jeremiah Duncombe, plaintiff was denied conference benefits. The organizations were knowledgeable of former Pres-

ident Pastor Jeremiah Duncombe history and failed to take proper actions against him.

Defendant No. 10   The defendant Jane Doe is one Former President Jeremiah Duncombe, fiancé that harassed me and threatened me repeatedly.  On or about 1993, Jane Doe harassed  and threatned me by stating, "if you don't listen to our leaders the former president Jeremiah Duncombe, you know what will happen to you."  When the plaintiff did not comply, the plaintiff was further harassed by Jane Doe reporting damaging and falsify words about the plaintiff, which was apart of her being terminated from the Bahamas conference in Nassau.

Defendant No. 11   The defendants are abusive to their powers. On or about 1993 former President Pastor Roach allowed John Doe to harassed me by asking me "if I would do the same job is adopted daughter does to achieve her education, "when the plaintiff did not comply it was used as apart of plaintiff  being terminated from the Bahamas conference. The organization was knowledgeable of the Former President Pastor conduct but failed to take take the proper actions against him.

Defendant No.12   The defendants Jane Doe is one of Former President Pastor Roach fiancé, that harrased the plaintiff.  On or about 1995, I was working in the Bahamas Jane Doe approached me and stated that she is a friend of former President Pastor Hugh Roach and that she is "bright," as a result Jane Doe received Conference benefits such as a green card.

Defendant No. 13   The defendant is abusive to their powers. On or about 1986, I was attending a conference meeting held at West Indies College when Former President Leonard Johnson made sexual advancement to me, when I did not comply I was **denied confere**nce benefits and was further used to terminate my employment from the Bahamas conference.  Defendants failed to take proper actions.

Defendant No. 14   The defendants is one of the Former President Leonard Johnson feancie. Jane Doe was allowed conference benefits  such as a green card because she was the fiancie of the Former President Leonard Johnson.

Defendant No. 15   The defendants are abusive to their powers. On or about 1990 the plaintiff was att-

ending at church services at the Living Faith Seventh day Adventist church located in in Nassau Bahamas, when John Doe whose profession a medical doctor and is associated with the Bahamas Conference, approached the plaintiff and sexually assaultend the plaintiff in a forcesable manner. Witness are John Doe wife, church members van driver of the Living Faith Seventh day Adventist Church.

The organizations were knowledge about John Doe history and failed to take proper actions against him.

Defendant No. 16 On around or about 1989 the plaintiff was at the Bahamas Conference office located in Nassau, Bahamas.  The defendant Everton Ennis called the plaintiff a "ORE" in the presence of former President Jeremiah Duncombe.

Defendant No. 17  Defendant is abusive to is powers. On or about 1993 Pastor C. Melvin made sexual advancement to me at the Bahamas Conference office located in Nassau Bahamas when I did not comply I was fired, the defendant Pastor C. Melvin Lewis insisted to sexually assaulting me by forcing his hand on my breast. The organizations were knowledgeable about Pastor C. Melvin Lewis conduct and failed to take proper actions against him.

Defendant No. 18   Defendant is abusive to his powers. On or about 2006 I made complaint to President Honore at his office located at 115-50 Merrick Queens New York. About there abusive leaders, but the defendant President Honore failed to take proper actions against their leaders.

Defendant  No. 19   Defendant is abusive to their powers.  On or about 1996 Pastor Brown informed the plaintiff in his office located at 115-50 Merrick Blvd. Queens New York, that someone has called their offices and that they had to stop the process of the plaintiff green card, the defendant Pastor Brow did not tell the plaintiff the name of the individual that called their offices.

The organization was knowledgeable of the individual that called their office but failed to take proper actions against this individual. The plaintiff successfully did the job that she was hired to do, such as generating money to the publishing department, but plaintiff was further harassed by one of the defendants Pastor Brown fla-

nce  stating that, the plaintiff is not "BRIGHT."

**Defendant No. 20**   The defendant Jane Doe is one of the fieance of Pastor Brown.  The defendant Jane
Doe  harassed the plaintiff by stating that the plaintiff is not "BRIGHT" and that she
has a child for Pastor Brown, as a result Jane Doe received conference?
The organizations were knowledgeable of Pastor Browns conduct but failed to take
proper actions against him.

**Defendant No. 21**  The defendants are abusive to their powers. On or about 1999 I was at the Presleys
home located in Queens Wexford Terrice, New York when I sexually assaulted by
Pastor Presley in front of his families in a forcible manner, the plaintiff resisted,
and informed Pastor Presley that she was not interested.
The organizations were knowledgeable of Pastor Presleys history and conduct but
failed to take proper actions against him.

**Defendant No. 22**  The defendant is abusive to their powers, the defendant Mr. Presley  harassed me
at the conference office located at 115-50 Merrick Blvd. Jamaica, Queens by want-
ing me to meet with him in a darkened area of the office the defendant Mr. Presley
stated "it's about your freedom in this Country."
The organizations knew was knowledgeable about Mr. Presleys history but failed to
take proper actions against him.

**Defendant No. 23**   The defendants are abusive to their powers. On or about 1995, defendant Teddy
Thordan kept harassing me every day by calling my phone as well as inviting
me into his office and stated that "it's a long time that he has being praying every
day for this and he believe that God wants us to be together. "The Conference wo-
rakes encouraged  the defendant Teddy Thordan to marry me although they were
aware of is dsyfunctionally and abusive marriage with his wife which seeked protect-
iion such as running away from him.
The organizations is also knowledgeable of Mr.Teddy Thordan history but failed to
actions against him.

**Defendant No. 24**    The defendants are abusive to their powers, on around and about 1991 I worked for
former Principal Vincent Peterking at the Seventh day Adventist Collage High School

located in Manchester, road Mandeville Jamaica, W.I. the defendant did not pay me.

Defendant No. 25 The defendants are abusive to their powers. On or about 1973 the defendant Mrs. Mighty that practices the "SACREMENTA" came in my home located at 7 Storks Street May Pen Clarendon Jamaica W.I. it was approximately midnight I was awakended and disturb to find her standing over my bed with a silver knife to kill me. the defendant Mrs. Mighty stated, "it's very hard to kill her if she is not fast asleep" the defendant Mrs. Mighty has committed this cruel act before such as murdering her brother. The defendant Mrs. Mighty continued to stalked and harassed me such as on or about 1995 while I was at the Adventist School located in Linden Blvd. Mrs. Mighty approached the plaintiff and wanted the plaintiff to sit beside her, then she harassed the plaintiff by telling her as stated "I got my green card with it, what ever I did they did not used it against me."

Defendant No. 26  The defendants are abusive to their powers. On or about 1998. The defendant Former Pastor Law allowed is fiancé he had a child with to harassed me, the defendant former Pastor Law has continued to harassed me by coming to my work place on Jamaica ave Queens New York,  and told me I am old now in addition the defendant Former Pastor Law son admitted that he could not kill me.

Defendant No. 27 The defendant is abusive to their powers. On or about 2009 I was at Conference office located at 7 Shelter Rock Road Manhasset, New York 11030-3222. I made complain to defendant President Pastor G. Earl Knight about the abuse I was undergoing from his leaders in the Conferences, President G. Earl Knight failed to take proper actions against their leaders as a result these abusive leaders continued to harrassed and stalked me.

Defendant No. 28    The defendant is abusive to his powers.  On or about 2001 I began working for the Grater New York Conferences, located at 7 shelter Rock Road Manhasset, New York . The conference leaders told me they would put in my green card but I need a letter of recommendation and references in order for my green card application to be processed. I submitted my recommendation and reference, that was recommended from Publishing Director Pastor Brown I worked for at the 115-50 Mer-

ick Blvd. Jamaica, NY 11434 United Stated, Conference but the Grater New York

Conference did not accept my recommendation and references.

Defendant No. 29   The defendant Jane Doe is the assistant secretary of the Publishing Director of

Grater New York Conference at 7 shelter Rock Road Manhasset, New York.

On or about 2001 Jane Doe Harassed me by informing me she had an aff-

air with John Doe the Publishing Director and a child and that is the reason

she got this job.

Defendant No. 30   The defendant Jane Doe is one of the Assistant Secretary of the Grater New York

Conferences.  On or about 2009 Jane Doe harassed me at the Grater New York

Conference located at 7 shelter Rock Road by stating "I don't have anything."

I was also informed by the Publishing Director of the Grater New York Confer-

fences that they were not able to process my green card because someone

called their offices.  The plaintiff did the job she was hired to do such as gener-

ating money to the publishing department, but was denied conferences benefits.

Defendant No. 31   The defendant is abusive to their powers.  On or about 2001 I was working with

Mark Gordon in Brooklyn New York, when he harassed me by calling me a

"ORE."

Defendant No. 32   The defendant is abusive to their powers. On or about 2003 I made complain

to President Pastor Isreal Leito about the abuse of their leaders I am undergoing

such a notarized letter but President Pastor Israel Leito failed to take proper

actions against their leaders.

Defendant No. 33   The defendants are abusive to their powers. On or about 1985 I was at attending

a Church service located at Denbigh Seventh Day Adventist, Jamaica W.I. Pastor

Dudley made sexual advancement to me. When I did not comply he forcefully

held the plaintiff and throw her body towards a live electric road side light post.

The organization was knowledgeable of Pastor Dudley Dixon conduct and failed

to take the proper actions.

Defendant No. 34   The defendants Jane Doe is one of Pastor Dudley Dixon fiance. On or about

2001, Jane Doe harassed me by stating that she got Conference benefits such

as green card, and that the life she lived with Pastor Dudley Dixion was not us-
ed against her to stop her green card.

Defendant No. 35   The defendant is abusive to their powers.  On or about 1988, I was at the
Conference Office located at 58 Brunswick Ave, Spanish town Jamaica, W.I.
Mrs. Gunter informed me that, they all know about my life and my history and
that if I don't listen to her today by buying this material, whatever you do
can be used against you.

Defendant No. 36   The defendant John Doe has been stalking me for the past forty years.  On or
about 1989 I was attending West Indies College located at Manchester road
Mandeville, Jamaica, W.I. defendant John Doe with one of his family's approach-
had me by stating "can I go out with you" immediately I walked away, and John
Doe began threatening me. Around or about 1994 when I arrived in the United St-
ates, and was shopping on Jamaica, Ave Queens New York. John Doe and is families
approached a second time, and wanted to know if I can have recognized them, to ha-
ve  relationship with John Doe. On or about 1999 John Doe continued to harrassed
 the plaintiff by saying he doesn't have a place to live, the plaintiff did not recognize
that it was the same John Doe, whom she met five years ago on Jamaica ave, that
 she did not want to see. The defendant used this situation and drugged the plaintiff
and sexually assaulted the plaintiff in her home. The plaintiff did not want her life to
to be in the public so she did not report the abuse. The defendant John Doe con-
tinued to harrassed the plaintiff by changing is name and is appearance, such as is
face, so he cannot be recognized.  On or about 2012 the plaintiff was coming from
a grocery shopping in Connecticut it was a snow storm when John Doe approa-
ched the plaintiff the third time to harrassed her, by giving her a ride, the defend-
told the plaintiff his name is Jacob so that the plaintiff cannot recognized him.
The defendant began to ask the plaintiff about her immigrant status such as "did
you ever get through with your immigration papers, I can give you reference if
you ever needed a job." The defendant insisted to continue harassing the plain-
tiff by giving his telephone number to her, to call him if she should have any

problems were she is living.  The plaintiff had to move from her apartment to 26 Branford Street not knowing that the defendant John Doe instigated the problem, as well as not knowing that the defendant John Doe lived at 26 Brandford street.  The plaintiff had to move again has the defendant John Doe continued to harassed her such as walking naked in front of her while she came out from the bathroom.  After the plaintiff moved out from 26 Branford street, the defendant continued to harassed her by talking to her landlord, the plaintiff got an eviction which the defendant John Doe was involved in. Exhibit No. 1.

Defendant No.37    The defendant Jane Doe is the Land lord agent of the apartment I rented, On or about 2013.  I signed  a lease agreement  to live at  860 Asylum ave Hartford, Ct. but the plaintiff was unable to live there because John Doe communicated with the plaintiff's landlord agent. On or about 2014 the defendant Marisol Velez stated "I am glad to meet John Doe." The plaintiff had to hire an attorney about this sit-auction. Exhibit No. 2

Defendant No. 38.    The defendant Jane Doe is my former landlord of the apartment 860 Asylum ave. Hartford, Connecticut.  On or about 2013 I tried to make arrangement to pay the balance of my rent, the landlord Jane Doe told me she did not want me in the build-in.

Defendant No. 39    The defendant is my former landlord of the apartment located 26 Branford Street Hartford, Connecticut.  On or about 2012, former landlord Jane Doe allowed former President Pastor Trevor Baker daughter to be in the apartment I rented from her.

Defendant No. 40    The defendant Jane Doe is one of the former President Herbert Thompson fiance On around and about 2009, I was at the Vassar Hospital located at 1 Pine Street Poughkeepsie, New York Jane Doe is an employer of the Vassar Hospital, Jane Doe harassed me by stating that "she has a child for the President and, she has to talk to him."  I was assigned by the Ethan Allen's Agency to take care of a patient in the Hospital, Jane Doe continued to harassed me by giving my patient an over doses of the morphine, the patient died as a result of the over does of morphine. I was not

allowed to be in the building. I made a complain to my supervisor of the Ethan Allen

Agency telephone number (845) 471-9667. Exhibit No. 3.

Defendant No. 41  The defendant Jane Doe is former employee of Y.W.C.A located in Hartford Connecti-

cut. On or about 2012, I was a client of the Y.W.C.A, Jane Doe was my case manager

Jane Doe harassed me by stating that "I violated a woman and that she cannot

help me with anything. When I asked Jane Doe who gave her those falsify inform-

ation about me, Jane Doe said she cannot tell me or she can get fired. On or around

2012 I hired  Attorney James D. Heartt telephone number (585)425-8682.  Attorney

James D. Heart did an investigation about the issue me being black mailed as well as

a letter to the Y.W.C.A.

Defendant No. 42  The defendant Jane Doe is a fiancé of one or two of the defendants in the organi-

zation that was exploited in her minor as a result of this situation the defendant Jane

Doe did not want the plaintiff working at the same building, she worked at in Cedar

Commons located at 3 John H. Stewart Street Newington, Connecticut. On or about

2012 the plaintiff was assigned to work in the Cedar Commons building at 3 John H.

Stewart Street Newington, Connecticut.  Jane Doe began to harassed the plaintiff as

stated." You need to look a man; they were your leaders." The defendant Jane Doe

continued to harassed the plaintiff such as administering the medication to plaintiff

patient the wrong way, as well as the defendant Jane Done rubbing her rear(bottom)

on the plaintiff face. The plaintiff had no other choice than to report the defendant

Jane Doe to her supervisor at the Cedar Commons facility and as well as her super-

visor from the Griswold Agency. After the plaintiff made complaint about the defend-

ant Jane Doe conduct, the plaintiff was asked to leave Cedar Commons building wi-

th damaging and falsify statement behind her name. The plaintiff had to further ma-

ke complaint to the Commission of Human Right in Hartford Connecticut telephone

number is (860)566-7710, and legal advice from attorney Aida Arus telephone (860)

904-2350. Exhibit No. 4.

Defendant No. 43   The defendant Jane Doe worked at the facility at Cedar Commons 3 John street

Newington, Connecticut. The defendant Jane Doe was given messages from

Jane Doe who was exploited in the Adventist Church to harassed the plaintiff.  On or about 2012, Jane Doe stated that "Jane Doe said to tell you she did not have any children for any of their leaders of the seventh day Adventist church.

Defendant No. 44 The defendant Jane Doe worked in the facility at Cedar Commons 3 John H. Stewart street Newington Connecticut telephone number (860)665-7901. On or about 2012 defendant Jane Doe informed me that as stated, "do you know what these people in the facility are planning to do to you."

Defendant No. 45  The defendant is abusive to their powers.  On or about 1994 when I came to the United States, the defendant John Doe came to my house located at Springfield New York.  The defendant John Doe had a Hattian accent is one of the publishing director of the Conference located at 115-50 Merrick Blvd., Queens New York. The defendant stated, "when I see your skills in the publishing department Jamaica, W.I. I would like to hire you in our conference to work as a skilled worker, a job we don't have enough Americans to do." We would make sure you receive Conference benefits such as a GREEN CARD. The defendant John Doe agreed to compensated the plaintiff Conference benefits which the plaintiff was entitled to as a skilled worker under the law but the defendant failed to give the plaintiff Conference benefits.

Defendant No. 46  The defendant is abusive to their powers. On or about 1995, I was at the Conference located at 115-50 Merrick Blvd Jamaica, Queens New York. The defendant John Doe one of the publishing directors approached me, and stated. The Conference wants you to married Teddy Thordan, and we believe you both will be a suitable match together." The defendant John Doe and the Conferences leaders were knowledgeable of Teddy Thornden dysfunctional and abusive marriage, and insisted that the plaintiff should married Teddy Thordan.  The defendant John Doe failed to give the Plaintiff Conference benefits that the plaintiff was entitled for.

Defendant No. 47   The defendant is abusive to their powers. On or about 2007, I attended a church service at a Seventh day Adventist Church School located in Brooklyn. The defendant John Doe is the Pastor of the Church and the principal of the School located in

Brooklyn New York. The defendant John Doe the Pastor of the Church approached the plaintiff in front of the church members and stated. "The President Pastor Trevvor says to tell you he is the one that has stopped your green card because of the woman in the Bahamas." The organizations were knowledgeable about Former Presilent Trevor Baker abusive conduct and failed to take proper actions against him.

Defendant No. 48   The defendant Jane Doe is the fiancé of the defendant John Doe which is the Pastor of the Brooklyn Church School located in Brooklyn New York. On or about 2007 the defender Jane Doe harassed the plaintiff by telling her she had a child for, her Pastor John Doe who is the Pastor of the Church. The organization were knowledgeable of the defender John Doe conduct and failed to take proper actions.

Defendant No. 49   The defendant John Doe is a member of the Beacon Hill Seventh day Adventist Church located in Beacon, Hill New York. On or about 2012 I was at a restaurant located in Poughkeepsie when John Doe member of the Beacon Hill Seventh day, Adventist Church , approached me and stated. "The President Pastor Tervor Baker said to tell you he his rich and have a lot of collectables and a lake house."

Defender No. 50   The defender Jane Doe is a member of the Poughkeepsie Seventh day Adventist Church located in Poughkeepsie, New York. On or about 2008 the defender Jane Doe approached the plaintiff while she was at Mental Health located at 29 North Hamilton Street Poughkeepsie New York and harassed the plaintiff by stating. "I got rape by a Seventh day Adventist Minister and I still remained a member of the Church, President Pastor Trevor Baker said to tell you the people voted for him because has education." In conclusion the plaintiff was always harassed and abuse by the defendant Former President PastorTreavor Baker and his agents wherever she seen is. The plaintiff had a mental breakdown and had to be at mental health for treatments and is presently continuing treatments. Exhibit No.4 and No. 5.

IN THE UNITED STATES DISTRICT COURT OF SOUTHERN DISTRICT COUNTY

STATES OF NEW YORK

|  |  |
|---|---|
| | ) |
| Marcia Robinson | ) |
|     Petitioner/Plaintiff, Pro-se | ) |
|        Vs | ) |
| Former President Pastor Trevor Baker | ) |
|     Respondent/Defendant | ) |
| | ) |
| | ) |
| | ) |

COMPLAINT

COME NOW the Plaintiffs, Marcia Robinson and files this complaint against Former President Trevor
Baker and or his agents, and in support thereof would show the following, to-wit:

1

The Plaintiffs Marcia Robinson are adult resident of New York County, United States. This action aris-
es under title VII of Civil Rights Acts of 1964, 112 U.S.C. 200e.

11

That the defendant Former President Trevor Baker is an adult  Citizen is of the New York County, Former
President Pastor Trevor Baker, and is licensed to do business and is doing business in New York, Co-
nty, as Ministers.

111

That the defendant and or his agents willfully, maliciously and intentionally inflicted emotional distress
upon the Plaintiffs without just cause, with the intent of harming the Plaintiffs were infact  irreparably
harmed by the defendants and or his agents.

1V

That defendant and or his agents have intentional, maliciously, and without just cause, slander the plain-
tiffs name and reputations in the community by making, false, malicious and intentional statements ab-
out the plaintiffs.  Plaintiffs as a direct and proximate cause there of the defendant and or his agents

have irreparable harmed the Plaintiffs.

111

V.

That defendant or his agents have intentionally, maliciously and without just cause, engaged in deceit-fulfy  business practices and malicious and intentional speak damaging falsify word against  Plaintiff to harm Plaintiffs reputation, and as direct and proximate cause there of the Plaintiffs reputation have be-en irreparable harm.

V1

That as a result Defendant's actions Plaintiff  forced to retain an attorney and have incurred cost Defen-dantis is liable.

WEREFORE PREMISES  CONSIDRED, Plaintiff demands, a judgment of and from the Defendant in the sum of One million dollars one million dollars ($3000,000.00) in actual damages and Three million dollars ($3000,000.00). as punitive damages along with a reasonable attorney fee and all cost.

WEREFORE PREMISIS FURTHER CONSIDERED, Plaintiff further pray that this court will issue a temporary injunction against defendant and or his agents from continuing to harm Plaintiff  and reptution  in the matter set out above in that Plaintiff have no other remedy in law or equity and will be irreparably har-med should said injunction not be issued.

Plaintiffs pray for other relief as in law or equity they may be entitled.

This the _____2nd.14_____ day of _Npril_____,20 _16_____.

Respectfully submitted.

*M. Robinson*

## RETAINER ARRANGEMENT

MARCIA ROBINSON ("Client"), requests and authorizes Aida N. Arús ("Lawyer") to represent him/her in matters arising out of his/her employment with

CEDAR MOUNTAIN  -CHRO NO. 1310497 .

1. Lawyer agrees to exercise her best efforts and professional ability, and will consult with Client on an ongoing basis regarding major decisions relating to this matter, including trial or settlement.

2. Client agrees to cooperate with Lawyer, assist Lawyer with preparing the case as Lawyer requests.

3. Client agrees not to do any act that impairs the value of the case.

4. Client agrees not to settle the case without Lawyer's participation and consent.

5. Client agrees not to speak to others or consult other lawyers about the case.

6. Client agrees to pay Lawyer's fee for professional services as follows: 33.3% percent of any settlement or recovery of the first $300,000.00, 25% of the next $300,000.00, 20% of the next $300,000.00, 15% for the next $300,000.00 and 10% of any amount recovered in excess of $1,200,000.00 of the total recovered, whether by way of settlement or award, before deduction of liens, costs and expenses or other items. Lawyer may deduct that sum for the amount to be paid to Client. The percentage recovery will be calculated before outstanding medical bills, expenses and costs of suit are deducted.

7. If Client makes no recovery, Client owes Lawyer nothing for legal services but must pay expenses.

8.  Lawyer reserves the right to terminate this contract if at any time he/she concludes that the claim is without merit.

9.  Client agrees that Lawyer cannot promise or guarantee a particular result.

10. This agreement represents the full agreement between Client and Lawyer. No other agreement, written or oral, exists, and discussions between Client and Lawyer that are not set forth in this agreement are not part of this agreement.

11. If Client and Lawyer agree to change any term in this agreement, the agreed-to change must be in writing and signed by both parties.

12. Legal representation is *only* for the purpose of conducting mediation/negotiation discussions with respect to this employer *only*.

I, _____, acknowledge that I have read this agreement fully, Understand the terms, and agree to them.  I received a copy of the agreement when I signed it.

Date: 1/21/14

Date: 1/21/14

MARCIA ROBINSON

AIDA N. ARUS
Law Office of Aida N. Arús, LLC

53

- MARCIA ROBINSON -

her. And they blackballed me from the organization.
Yeah. I wanted to stop it.
    Q.   When you say it was in your country --
    A.   Jamaica.
    Q.   -- did the incident take place in Jamaica?
    A.   Yes.
    Q.   And what organization didn't want you to make this claim?
    A.   Seventh-day Adventist.
    Q.   And they blackballed you from the organization --
    A.   Yeah.
    Q.   -- because of this claim?
    A.   Yes.
    Q.   When did that happen?
    A.   Over 30-odd years ago.
    Q.   Had you called the pastor from -- during the time that you were working from -- at the Wood Home?
    A.   No, sir.
    Q.   Okay. Now, was there an incident between you and a Tom Sawyer?
    A.   Yes, sir.
    Q.   What happened between you and Tom Sawyer?
    A.   Around the month of March 2012, he was telling

54

- MARCIA ROBINSON -

me about a business that he does which is very profitable.
But if I get caught, there are consequences. And I told
him that I was not interested.
    He has made close contact with me during the
time of the patient's birthday. And I said "I hope this
will just be it." After he made close contact while I was
taking care of a patient --
    Q.   What do you mean when you say "close contact"?
    A.   He hugged me. I have a picture with my
attorney, he hugging me, taking pictures.
    The patient was celebrating his birthday. And
he got permission to come and hug us while he take the
pictures.
    Q.   Was Tom Sawyer a patient?
    A.   No. He wasn't a patient.
    Q.   Was he a resident at the Wood Home?
    A.   No, he wasn't a resident. He claimed he was
working with Orra to get residence.
    Q.   Okay. So he wasn't living there?
    A.   Yes, he was living there.
    Q.   Okay. So he was living there --
    A.   Yes.
    Q.   -- and he made close contact with you?
    A.   With we.

55

- MARCIA ROBINSON -

    Q.   Do I understand that he's the one that hugged you?
    A.   He hugged me.
    Q.   And you have pictures of this?
    A.   I have pictures of that.
    Q.   Do you have them with you?
    A.   Yes.
    Q.   May I see them?
    MS. ARORA: They were produced as part of the last production.
    THE WITNESS: Just a minute, sir.
    MS. ARORA: This one?
    THE WITNESS: Yeah. Yeah.
    MS. ARORA: Look at it first again.
    THE WITNESS: Yes, it is it. That's at the birthday party.
    MR. STERN: Mark that, please.
    MS. ARORA: I think that's her original copy.
    MR. STERN: That's okay.
    MS. ARORA: Can we retain it since you have one in production?
    MR. STERN: Yes.
    THE WITNESS: And you asked me what

56

- MARCIA ROBINSON -

happened, and I'll just go to the --
    MR. STERN: Hold on one second. I want
to mark it and have you identify it.
    (Black and white copy of one photograph
received and marked as Defendants' Exhibit E for
identification.
    Q.   I show you Defendants' E for identification.
Are you familiar with that photograph?
    A.   Yes, sir.
    Q.   Do you know when that picture was taken?
    A.   Around in the month of March when the patient,
I took care of, celebrated his birthday.
    Q.   What year?
    A.   2012.
    Q.   Do you know who took the picture?
    A.   The patient's family. And I asked for --
    Q.   Tell me who's in the picture.
    A.   We have Tom Sawyer in the middle and Dede, one
of the caregivers, and me at the other end. And there's
the patient -- the patient is sitting in his wheelchair I
took care of.
    Q.   Okay. And facing Mr. Sawyer in the middle,
are you on his right?
    A.   Yes.

45072824-5d4f-43c4-b30b-d8f871dcabde

57

- MARCIA ROBINSON -

1
2    Q.   Okay.  And is he touching you in this picture?
3    A.   Yes.  His hand is over me.
4    Q.   Where is his hand?
5    A.   His hand is over my shoulder right here
6  (indicating).  He hugs me up here.  Yes.
7    Q.   And is this what you're claiming was close
8  contact between you and Mr. Sawyer?
9    A.   It's more than that.  The following week,
10  while I take --
11    Q.   No.  No.  Just -- is this -- earlier, you told
12  me that he was in close contact with you --
13    A.   Yeah.  This is one of the close picture --
14    Q.   -- and you said you had a picture of it.
15    A.   Yeah.
16    Q.   Is this the picture of the close contact that
17  you're claiming with Mr. Sawyer?
18    A.   One of them.  One of this -- this is one of
19  the claim.  But this is not the exact claim.  I don't have
20  a picture of what he did at that point.
21    Q.   Okay.
22    A.   While I took care of this patient, in the
23  middle, and was bending over, he was behind me, and I
24  didn't see him, and he touched me inappropriately on my
25  private part.  And I called the polices when he did it.

58

- MARCIA ROBINSON -

1
2    Q.   Did that occur at the same time as this
3  picture being taken?
4    A.   No.  It occurred on the next day.
5    Q.   Okay.  And on the next day --
6    A.   Yes.
7    Q.   -- were you cooking in the kitchen?
8    A.   The next day, while I was taking care of this
9  patient in the wheelchair, I bent over to take him up, and
10  Tom Sawyer come over me and push his hand up on my private
11  part, because I had on a -- my uniform.  And he pressed
12  his hand and pushed up for in my private part, and he
13  left.  And I called Orra, and she ignored me.  And he was
14  -- he left immediately.
15        At that point, I didn't call the police.  And
16  then the next day, while I was by myself, I saw him coming
17  towards the place, the building again, because he sleeps
18  there, but he didn't sleep there that night.  He didn't
19  sleep there that night.  He left.  And the next day, I was
20  by myself with all the patients.  And I was afraid to be
21  there by myself with him, with Tom Sawyer, because of what
22  the incident took place the day before, and nothing
23  happened.  I did not want the situation to happen again
24  with me and him.  When he touched me in my private part,
25  we begin to say -- we have an altercation going back and

59

- MARCIA ROBINSON -

1
2  forth.  He tried to convince me it's okay.  And he press
3  his hand on me going back and forth, and tell me it's
4  fine.  He told me it was okay by gripping my shoulder.
5  And I pushed his hands off my shoulder, and I pushed his
6  arm off my shoulder, and he gripped me, he tell me it's
7  fine.  And I told him, "It is not fine."  So we had an
8  altercation like.
9    Q.   When you say he touched you on your private
10  part --
11    A.   Yes.
12    Q.   -- are you referring to your backside?
13    A.   No.  My private.
14    Q.   Your vagina?
15    A.   Yes, sir.
16    Q.   Was there anybody else present?
17    A.   Yes, sir.
18    Q.   Who else was present?
19    A.   Dede was there, but she refused to comply to
20  what happened, because they are friends.
21    Q.   Did she see it?
22    A.   Oh, yeah, she saw.  She was sitting right --
23  the next chair.
24        So while I was by myself, I didn't want to
25  situation to happen again.  I was by myself with all the

60

- MARCIA ROBINSON -

1
2  patients, and he came.  And -- I was by myself.
3    Q.   And if I understand correctly, you reported
4  this to Orra Wood?
5    A.   Yes, I did.
6    Q.   And when did you report it to Orra Wood?
7    A.   Immediately.  When he touched me
8  inappropriately.
9    Q.   Okay.
10    A.   And he left.
11    Q.   And what did she say to you?  No.  No.  No.
12  Let me back that up.  What did you say to her first?
13    A.   I told Orra that Tom Sawyer touched me
14  inappropriately, and I want her to talk to him about it
15  because it's not going to happen again.  And she said, Oh,
16  that is just an altercation.
17        I said, "It's more than altercation."
18        So Dede was off the next day.  I was with Tom
19  Sawyer.  At that point, he came back the next day.  I
20  didn't say nothing to him at that point.  He was very
21  threatful (phonetic) to me.  And he told me, before I
22  could say anything to him, If you call the police, you're
23  going to be fired.
24        And so I said to him, "Tom Sawyer, you're not
25  going to threaten me and it's not going to happen again."

15  (Pages 57 to 60)

45072824-5d4f-43c4-b30b-d8f871dcabde

61

- MARCIA ROBINSON -

1  
2      So he threatened me. And I called the police
3  about the situation, that I don't want it to happen again.
4      Q.   So when you say you called the police --
5      A.   Yes.
6      Q.   -- what -- whom did you call?
7      A.   I called 911, and they responded.
8      Q.   Who responded?
9      A.   The police officers.
10     Q.   Do you know from what department?
11     A.   I think it's Middletown.
12     Q.   Was it the state police?
13     A.   I don't know. I think it's the state
14 troopers. I don't know.
15     Q.   Do you know the name of the state trooper?
16     A.   I don't have their name.
17     Q.   Was it Trooper Todd Whorholic (phonetic); does
18 that ring a bell?
19     A.   It sounds like that, yeah, Whor --
20     Q.   Did he come and talk to you about the
21 incident?
22     A.   When they called me they said if there's any
23 drugs. I said, "Not at this point."
24     Q.   Any what?
25     A.   Drugs.

62

- MARCIA ROBINSON -

1  
2      Q.   Drugs?
3      A.   D-R-U-G-S. I said, "Not at this point. But
4  he's threatening me and I'm afraid to be here with him,
5  because the day before, he touched me inappropriately."
6      The officers came with a paper, and take my --
7      Q.   So the officer came a day after the incident?
8      A.   Yes.
9      Q.   Okay.
10     A.   The reason why I had to call, Tom was
11 threatening me at that point, and I was by myself.
12     Q.   Had Mr. Sawyer threatened to tell Orra Wood
13 that you were cursing at a patient?
14     A.   I don't know, because I don't curse at any
15 patient. And the police officer --
16     Q.   Well, is that what he threatened you, that --
17     A.   No. He's told me, at that point, if I report
18 what happened the day before, that I will be fired.
19     Q.   Well, didn't Mr. Sawyer tell you that if you
20 cursed at the patient again, he was going to report you to
21 Orra Wood?
22     A.   I did -- well, no. I didn't say nothing about
23 cursing the patient. He threatened me and said if I call
24 the police --
25     Q.   Okay.

63

- MARCIA ROBINSON -

1  
2      A.   -- on him --
3      Q.   So the police came?
4      A.   Yes.
5      Q.   And you met with a trooper?
6      A.   Yes.
7      Q.   Did you give the trooper a statement?
8      A.   Yes, I did.
9      Q.   Did you sign the statement?
10     A.   He did not ask me to sign it.
11     Orra told him I have a thing with men. And he
12 said, Oh, I'm not going to bother to ask you to do
13 nothing.
14     Q.   Did he also speak with Mr. Sawyer?
15     A.   He spoke with Mr. Sawyer because he was there
16 at that time.
17     Q.   Did he speak with Dede?
18     A.   I think he speak to Dede over the phone. I'm
19 not too sure if Dede was there at that point. I think she
20 was off that day. Yes, she was off that day. And I think
21 she went on the phone and speak with Dede.
22     Q.   So did you file any charges with the police
23 against Tom Sawyer?
24     A.   Yes, I did.
25     Q.   Do you have a copy of those charges?

64

- MARCIA ROBINSON -

1  
2      THE WITNESS: Do we have the copy?
3      A.   They did came at one point and --
4      MS. ARORA: Yeah.
5      A.   -- I gave -- they make me give a statement.
6  And I signed it.
7      MR. STERN: Do you have a copy of that?
8      MS. ARORA: We don't have a copy of that
9  right now. But I can produce it.
10     MR. STERN: Okay.
11  
12 DOCUMENT/INFORMATION REQUESTED:
13     Q.   What happened with the charges that you filed
14 against Tom Sawyer?
15     A.   At that point, the police officer said they
16 would not lock him up, at that point. And I do -- going
17 to have an attorney to take care of that situation because
18 I couldn't find nobody.
19     At the point when he did it, I make sure to
20 tell the officers immediately. And they didn't do enough.
21 They've seen, you know -- I don't know.
22     But Orra told them I have a thing for men. I
23 didn't do nothing wrong, at that point, for him to behave
24 like that.
25     Q.   Did you make any claims against Mr. Sawyer for

16 (Pages 61 to 64)

45072824-5d4f-43c4-b30b-d8f871dcabde

65

- MARCIA ROBINSON -

1
2  any sums of money?
3     A.  No, I did not.
4     Q.  Do you have any incident with a Renee Berrel?
5     A.  Yes, I did.
6     Q.  What happened between you and Renee Berrel?
7     A.  During the time when me and Renee Berrel was
8  together, the patient was watching TV.  She turned the TV
9  to herself.  I was sitting with Mr. Otter (phonetic),
10 because you got to sit with him.  She was sitting on the
11 other side of the sofa.  And she wanted to watch the TV by
12 herself.  And Mr. Otter likes to watch TV.  So she turned
13 the TV towards herself, where she could see the TV by
14 herself.  And so I told her, I said, "Excuse me.  But the
15 patient is watching the TV."  I think she wanted to watch
16 her own station.  And she came over to me and push me in a
17 rude way.  And when she push me, I went back and I pushed
18 her back.  And so we went into what you call stop hitting
19 me.  She was hitting me and me defending myself, because
20 she's a very violent person, at times.  My leg got a
21 contusion, and I sprained my ankle, and I sprained my
22 thumb, and I had to go to the emergency room.  I called
23 Orra immediately.  I notified the police officers, because
24 this was a very violent act for her to do me, and I didn't
25 do her nothing.

66

- MARCIA ROBINSON -

1
2     Q.  Did you file a complaint with the police
3  against Renee Berrel?
4     A.  I file a complaint and, I think, I signed a
5  paper, but I didn't go further with it.
6     Q.  Okay.  Do you know a Reverend David Kingsley?
7     A.  I don't remember the name, but a reverend was
8  coming there.
9     Q.  Did he ever offer to obtain counseling for
10 you?
11    A.  No.
12    Q.  Did Orra Wood ever offer to obtain counseling
13 for you?
14    A.  No.
15    Q.  Was there a time that you won a weekend at a
16 timeshare in Connecticut?
17    A.  Could you repeat that.
18    Q.  Did there come a time when you won a weekend
19 at a timeshare in Connecticut?
20    A.  No.
21    Q.  During the time you worked at the Wood Home --
22    A.  Yeah.
23    Q.  -- did you spend a weekend at a timeshare in
24 Connecticut?
25    A.  No.

67

- MARCIA ROBINSON -

1
2     Q.  Did you ever make application to purchase a
3  timeshare in Connecticut?
4     A.  Could you explain what a timeshare is.  I
5  don't really know about a timeshare.
6     Q.  Well, a -- the right to use property --
7     A.  Oh.
8     Q.  -- like a condominium, for a week or for
9  2 weeks or for a lesser period of time on an annual basis.
10    A.  No.
11    Q.  No?  You never attempted to purchase a
12 timeshare in Connecticut?
13    A.  No.
14    Q.  Did you ever tell anybody that you were the
15 owner of Wood Adult Home?
16    A.  No.
17    Q.  Did you ever tell anybody that you earned over
18 $200,000?
19    A.  Absolutely not.
20    Q.  Did you ever tell anybody that you owned a
21 lake house in Pennsylvania, which was actually owned by
22 Orra Wood?
23    A.  No.
24    Q.  Okay.
25    A.  Could I --

68

- MARCIA ROBINSON -

1
2     Q.  No.  Did you -- while you worked for the Wood
3  Home --
4     A.  Yeah.
5     Q.  -- did you order cable service?
6     A.  Yes, I did, with the permission --
7     Q.  Did you tell the cable --
8     A.  -- from Orra.
9     Q.  So you ordered the cable service.  Did you
10 tell the cable company to bill it to Orra Wood?
11    A.  No.
12    Q.  Do you know whether the account was set up
13 with it being billed to Orra Wood?
14    A.  I did not use the service.  I was not allowed
15 to use it, so I stopped the service.
16    Q.  Well, when you had the service initially --
17    A.  I did not get the service.  It was stopped
18 completely.
19    Q.  Well, who contacted cable to set it up?
20    A.  I got permission through Orra, because I had a
21 computer, a laptop at that time.  But it was a lot of
22 complication to set it up.  And we didn't get permission
23 for what we had to go through, so I stopped the service.
24 I stopped it completely.
25    Q.  Was the service ever billed to Orra Wood?

17 (Pages 65 to 68)

69

- MARCIA ROBINSON -

1
2   A.   I don't think so, because we didn't have it.
3   They were -- got paid, and, you know, I didn't bother with
4   it.
5        THE WITNESS:  Could I say something about
6        the share?  She, at one point, I don't have
7        the date here, but she said to me before I
8        left that I'm using her property to make
9        money.  And I told her I did not do that,
10       about the thing you said a while ago.  I
11       explained to Orra I have not used her property
12       to obtain money or to do anything.  And I
13       thought at that point, when she accused me of
14       using her properties that it was settled
15       there.  Because she was accusing me, at one
16       point before I got fired, that I'm using her
17       properties, telling people I own it.  And I
18       said, "No, I have not done that."
19   Q.   By the way, were you fired from any positions
20   prior to working for Orra Wood?
21   A.   Yes.
22   Q.   From what position were you fired?
23   A.   While I worked at Avalon Gardens, when I
24   followed patient protocol, I got fired.
25   Q.   And when was that?

70

- MARCIA ROBINSON -

1
2   A.   Before I came to Orra Woods.
3   Q.   And you were fired, and then you made the
4   claim against Avalon?
5   A.   Yes, sir.
6   Q.   And why were you fired by Avalon?
7   A.   When I -- when I followed patient protocols.
8   Q.   So you're saying that they fired you because
9   you were following their rules?
10   A.   I was following what is right for patient care
11   and what is right for myself.
12   Q.   Why did they tell you they fired you?
13   A.   They didn't give me the reasons.  But when I
14   applied to unemployment, they said it was a misconduct to
15   follow protocols.  Because I didn't do nothing wrong.  It
16   was protocol.  I was doing the right thing for the
17   patient.
18        It was reported to the state.  I reported it.
19   And the state said whenever a situation comes up, arise
20   about me getting fired, I could always call them and do an
21   investigation.  So I did follow protocol by alerting the
22   state of the situation that happened at Avalon Gardens.
23   And they did not like that.
24   Q.   I understand.  I'm trying to find out from you
25   what reason Avalon gave for firing you.

71

- MARCIA ROBINSON -

1
2   A.   They didn't give me -- they said misconduct.
3   Q.   And do you have any idea what misconduct they
4   were claiming?
5   A.   No.  They did not.  Because it was ruled out
6   at the court on unemployment.
7   Q.   Were you fired from any other positions?
8   A.   Give me (indicating) -- I was fired from
9   Marley job, the patient, the private care job in
10   Manhattan, after I followed patient protocols.
11   Q.   And is that after you were fired by --
12   A.   Avalon ---
13   Q.   -- that position, did you make a claim there
14   also?
15   A.   Yes, I did.
16   Q.   What was your claim?
17   A.   My claim was to get -- to be paid for the
18   hours I worked for, because it was a 24 hours care.
19   Q.   Why were you fired there?
20   A.   Because I followed patient protocol.
21   Q.   No.  No.  No.  You're telling me you followed
22   patient protocol.  What did the employer claim was -- why
23   did they fire you?
24   A.   They didn't fire me for -- yes.  At that
25   point, I was hired to take patient to a senior citizen --

72

- MARCIA ROBINSON -

1
2   a senior citizen place in the day for her daycare.  They
3   did not tell me -- they say it was a daycare.  But it was
4   not a daycare, it was a church basement.  And Marley got
5   very sick going there.  As a result of one or two reasons,
6   it was not a daycare, as they say, it was a church
7   basement.  And there was a smell of gas.  And I was
8   swelling that gas too.  She was not able to be changed,
9   because there was not a handicapped bathroom or a bed.
10   And at that point, I didn't want her to get worse.  So I
11   told a family member that the place she hired me for is
12   not a right senior center, and it could pose a lot of
13   health problems for the patient.
14   Q.   Were you fired because the patient hadn't been
15   changed?
16   A.   No.  I was fired because I told them of the
17   situation, what she has to go through when she was there,
18   that she was not able to change, and I don't want her to
19   get sores and cannot be changed.  She had to sat for long
20   hours, for over 4 hours.  The patient had to sat for too
21   many long hours without being changed.  And I did not want
22   to look like I'm not doing my job.  Because they did not
23   provide a place for her to be changed.  So I told a family
24   member, and they did nothing.  However, Marley Orksysin's
25   sister say --

18 (Pages 69 to 72)

45072824-5d4f-43c4-b30b-d8f871dcabde

73

- MARCIA ROBINSON -

1
2    COURT REPORTER: Marley Ochancey
3    (phonetic).
4        THE WITNESS: Marley Ochancey. Marley,
5    O-R -- Orskysin.
6    Q.   Can you spell the last name.
7    A.   O-R-S-K-Y-S-I-N. I'm spelling it to the best
8    of my ability. But her first name is Marley. She is
9    incontinent and have to be taken care of every 2 hours.
10   They didn't provide a facility. It was a basement, a
11   legal basement, illegal basement. And so I told the
12   family member, because I have a right to do so, probably
13   they didn't know, it was -- you know, she can't be
14   changed. And she had sores on her bottom. I got her with
15   sores. And the sister told me if I don't have to take her
16   there because it's low class, don't take her there. And
17   so I did what Rose says. And in doing that, it caused a
18   problem.
19   Q.   I'm going to show you what's been marked as
20   Defendants' Exhibit C for identification. This is the
21   Defendant's Rule 26 Disclosure. I'm going to be
22   addressing some of the exhibits that are attached here.
23   I'd like to start with -- there's an exhibit sheet that
24   says Paragraph 2a.
25       When you worked at the Orra Wood Home --

74

- MARCIA ROBINSON -

1
2    A.   Yes.
3    Q.   Was there an employee sign-in sheet?
4    A.   No.
5    Q.   Okay. Let me show you what's been marked as
6    Exhibit 2a -- well, as part of Exhibit C. These are
7    documents entitled -- on the top, it says Employee sign-in
8    sheet?
9    A.   Yes.
10   Q.   Have you ever seen this document before?
11   A.   Yes, sir.
12   Q.   Okay. Now, each day that you worked at --
13   A.   Yes.
14   Q.   Let me finish my question.
15       Each day that you worked at the Wood family
16   home, did you sign one of these sheets?
17   A.   I didn't sign this. This is not my writing.
18   Orra signed these.
19   Q.   Does your handwriting appear anywhere on this
20   page?
21   A.   This is my handwriting (indicating).
22   Q.   When you say "my handwriting," are you
23   referring to the signature box?
24   A.   Yes, sir.
25   Q.   And is that your signature next to August

75

- MARCIA ROBINSON -

1
2    26th, August 27th, August 28th, and August 29th.
3    A.   Yes.
4    Q.   And was the information on this page filled in
5    by Orra Wood --
6    A.   Yes.
7    Q.   -- before you signed your name?
8    A.   I think it's -- she gave me this -- she gave
9    me the time sheet filled out, and then she said, Just sign
10   your name.
11       I told her about these hours that is here is
12   wrong.
13   Q.   Okay. So looking at the first page --
14   A.   Yes.
15   Q.   -- August 29th, 2010.
16   A.   Yeah.
17   Q.   The very first entry says August 25, moved in.
18   Do you see that?
19   A.   Yeah. Yeah.
20   Q.   And then the next date is August 26th.
21   A.   Yeah.
22   Q.   Are we in agreement that you started the job
23   on August 26th, 2010?
24   A.   I started the same day when I got the
25   interview. I started the same day.

76

- MARCIA ROBINSON -

1
2    Q.   Well, the very first day says August 26th,
3    that's when the hours are recorded.
4    A.   Okay. But I start before. The same day I
5    started with Cheryl working.
6    Q.   Well, earlier, you told me, I think, it was in
7    September. Do you know what date you actually started the
8    job?
9    A.   No.
10   Q.   Okay. So here you signed a document on August
11   26th, that's your signature, and it shows that the time in
12   was 9?
13   A.   Yes.
14   Q.   And the time out was 12?
15   A.   Yeah. But it is wrong.
16   Q.   And then it shows, Time in: 2?
17   A.   Yes.
18   Q.   And Time out: 4?
19   A.   Yes.
20   Q.   Now, did you work from 9 in the morning until
21   12?
22   A.   Before that. 6 a.m. in the morning straight
23   until 10:00 when the patient go to bed.
24   Q.   10:00 at night?
25   A.   Yes.

19 (Pages 73 to 76)

**77**

- MARCIA ROBINSON -

1
2    Q.   On August 26th?
3    A.   Right through the time that --
4    Q.   On August 26th, 2010, you worked from 6 a.m.
5    in the morning until 10:00 at night?
6    A.   Yes.
7    Q.   Do you have any written record to show that?
8    A.   She did not really give me anything to write.
9    But I did take records of the hours that I'm working for.
10   Q.   Do you have any record showing that you worked
11   from 6 in the morning --
12   A.   Yes.
13   Q.   -- to '10 at night --
14   A.   Yeah.
15   Q.   -- on August 26th, 2010?
16   A.   The dates -- I did not record all the dates.
17   But I did record most of the times when I work, and I gave
18   it to the attorney.
19        MR. STERN:  Do I have that?
20        MS. ARORA:  You're asking for August 26
21   only.  But we did produce those in our
22   production, her own time records.
23        MR. STERN:  I have your production, and
24   I'll get to that.
25        MS. ARORA:  Yeah.  So those are the ones

**78**

- MARCIA ROBINSON -

1
2    she's referring --
3        MR. STERN:  That's the only thing you
4    have?
5        MR. O'BRIAN DELLINGER:  Yeah.
6        MS. ARORA:  Yeah.  That's what's she's
7    referring to.
8        MR. STERN:  Okay.
9    Q.   So if I understand your testimony correctly --
10   A.   Yes.
11   Q.   -- you're saying that on August 26, 2010 --
12   A.   Yeah.
13   Q.   -- you worked from 6 in the morning to 10 at
14   night?
15   A.   Yes.
16   Q.   And yet, you signed a document saying you
17   worked from 9 in the morning to 12, and then you were off
18   from 12 to 2; you worked again from 2 to 4, and then you
19   were off from 4 to 5, and you worked from 5 to 7?
20   A.   That's Orra, she does the document like that.
21   I can't enforce her to put the writing on the paper.
22   Q.   Okay.  Now, so you say that from the very
23   first day you started working for Orra --
24   A.   Yes.
25   Q.   -- the time slip was wrong?

**79**

- MARCIA ROBINSON -

1
2    A.   The time slip was wrong.
3    Q.   Why did you sign it?
4    A.   Because she said that's the only way I could
5    get my money, I could get some money.
6    Q.   But you had no problem fighting with other
7    employers and making claims against them --
8    A.   Yes, I do.  I got my -- yes, I do it whenever
9    the hours are wrong, immediately, I showed them and they
10   paid me.
11   Q.   Did you sign any statement, give any letter to
12   Orra Woods, saying these hours are wrong?
13   A.   Already, we -- verbally, we talked --
14   Q.   Anything in writing --
15   A.   No, I didn't put it in writing.
16   Q.   -- from you --
17   A.   No.
18   Q.   -- to Orra Wood, claiming that these hours are
19   wrong?
20   A.   No.  I immediate -- verbally, we speak, and
21   she said that's how you -- and she said that's it.  And so
22   I didn't want to talk over her.
23   Q.   Now, if you turn the page -- please turn the
24   page.
25   A.   (Witness complies.)

**80**

- MARCIA ROBINSON -

1
2    Q.   Oh, I'm sorry.  Before you turn the page, in
3    the bottom left-hand corner of this time slip --
4    A.   Yeah.
5    Q.   -- is there a box that says "total hours
6    worked"?
7    A.   (No response.)
8    Q.   "Total hours worked"?
9    A.   Yes.
10   Q.   And what does it show for the total hours
11   worked for the week ending August 29th, 2010?
12   A.   28 hours.
13   Q.   And does it show the rate of pay?
14   A.   It shows 7.25.
15   Q.   Is that what you were paid, $7.25 an hour?
16   A.   Yes.
17   Q.   Does it also show the deductions from your
18   pay?
19   A.   Yes.
20   Q.   And do those deductions include social
21   security and Medicare?
22   A.   Federal, state, and --
23   Q.   DBL, disability?
24   A.   Yes.
25   Q.   And does it show your gross pay (indicating)?

20 (Pages 77 to 80)

45072824-5d4f-43c4-b30b-d8f871dcabde

81

- MARCIA ROBINSON -

1
2      A.   Yes.
3      Q.   Does it also show the check number and the
4  amount of the net pay?
5      A.   Yes.
6      Q.   Okay.  Now, what I'd like you to do is to look
7  through the rest of the time slips until the next pink
8  sheet.  And I will tell you that these are all of the --
9  they're all 2010.  Look through them.
10          MR. O'BRIAN DELLINGER:  What would you
11  like her to look at?
12     Q.   I'd like you to check to see if you've signed
13  each time slip on every single day that you worked.
14     A.   Yes, I signed the time slip.
15     Q.   Every single --
16     A.   But I did not write in the time.
17     Q.   No.  No.  No.  I understand you didn't write
18  in the time.
19     A.   Yeah.
20     Q.   But am I correct that every single time slip
21  has your signature on it?
22     A.   Yes, it does.
23     Q.   And you've signed next to every single day
24  that you worked?
25     A.   Yes, because she instructed me to do so.

82

- MARCIA ROBINSON -

1
2      Q.   Okay.  And every one of these time slips is
3  for a week period; correct?
4      A.   Yes.
5      Q.   And every time slip shows the gross pay and
6  the net pay; is that correct?
7      A.   Yes.
8      Q.   And the hourly rate?
9      A.   Yes.
10     Q.   And the total hours worked that week; correct?
11     A.   Yes.  But it is wrong.
12     Q.   Okay.  So the second -- the third time slip,
13  for example, for the week ending 9/2/2010...
14     A.   How much?
15     Q.   9/2.  9/2 -- right here (indicating).  No.
16  I'm sorry.  9/12.  I'm reading it wrong.
17     A.   9/12, yeah.
18     Q.   9/12 --
19     A.   Yeah.
20     Q.   -- what is the total hours worked in the
21  bottom left-hand corner?
22     A.   16 hours.
23     Q.   16 hours?
24     A.   Yeah.
25     Q.   But if I heard you correctly --

83

- MARCIA ROBINSON -

1
2      A.   Yeah.
3      Q.   -- you worked from 6 in the morning to '10 at
4  night --
5      A.   Yeah.
6      Q.   -- every single day you worked?
7      A.   Every single day.  And sometimes, there were
8  emergency.  We got to get up at night and call on.
9      Q.   So other than yourself --
10     A.   Yeah.
11     Q.   -- is there anybody that you know of --
12     A.   Yeah.
13     Q.   -- that can confirm --
14     A.   Yeah.
15     Q.   -- that you worked from 6 in the morning --
16     A.   Yeah.
17     Q.   -- to 10 at night every day?
18     A.   Yes, there were other people there.
19     Q.   Who?
20     A.   There were Dede, and we have Renee, and we
21  have -- well, Ederly (phonetic) is not there when I'm
22  there.  They're there and they see the patient condition
23  and they know I'm watching them.
24     Q.   So Dede --
25     A.   Dede.

84

- MARCIA ROBINSON -

1
2      Q.   -- and Renee Berrel?
3      A.   Yes.
4      Q.   Is there anybody else that can verify that you
5  were working from 6 in the morning until 10 at night every
6  day that you worked?
7      A.   And Frankie.
8      Q.   Frankie who?
9      A.   Frankie Davis.
10     Q.   Is that a patient or a worker?
11     A.   A worker.
12     Q.   Do you know where -- is that a male or a
13  female?
14     A.   She's a female.
15     Q.   Do you know where she is?
16     A.   At one point, she was in Monticello.  I don't
17  know if she's there still.  I don't know her contact.
18     Q.   Okay.  Is there anybody else that can verify
19  your hours?
20     A.   Well, Sarah was a patient, but she's -- she is
21  alert.  She was -- is alert, and she was living there.
22     Q.   Sarah who?
23     A.   I don't know her last name.  Sarah is her
24  first name.  And she was there temporarily.  But she's
25  alert, and she see the situation.

21 (Pages 81 to 84)

85

- MARCIA ROBINSON -

Q. Now, do you recall -- looking at this September 12th time slip, there's only 2 hours for September 10th, and there's only 2 hours for September 11th.

A. Yeah.

Q. Do you recall only working 2 hours those 2 days?

A. September 12th?

Q. No. September 10th and September 11th.

A. I cannot recall everything on top of my head. But I don't remember a day just working 2 hours. I don't remember, sir, honestly. I didn't remember -- every time I worked there, it was always a full day.

Q. The other thing is on this particular week, it looks as if you're off on September 8th and September 9th and also on September 12th. Do you recall being off 3 days that week?

A. Okay. I think after the situation with Tom Sawyer, if it was near 11, 12, I think I was my -- my -- my hours were reduced, and like she told me to get something else or whatever.

Q. This is --

A. Year '12.

Q. This is in 2010.

86

- MARCIA ROBINSON -

A. 2010?

Q. Yeah. This is September -- it's the week ending September 12th of 2010.

A. I can't recall --

Q. Just after you started.

A. Just after I started?

Q. Yeah.

A. I don't recall. This is very -- it's a lot, really, to remember, and I don't remember working 2 hours.

Q. But that's your signature?

A. Yes. I got to sign it, because she said sign it.

Q. So again, I'd like you to look at each of the time slips for 2010, and confirm for me that every single time slip that that's your signature.

A. Yeah. 2010?

Q. Yeah.

A. 2010. I don't see no more 2010 here.

Q. The years are up here (indicating). Okay.

MR. STERN:  Off the record.

(Discussion held off the record. Whereupon, following which, these further proceedings transpired.)

MS. ARORA: The question is: Are these

87

- MARCIA ROBINSON -

your signatures?

THE WITNESS: It's my signature, yes.

Q. On every page in 2010?

A. Yes.

Q. Every date has a signature next to it?

A. Yes.

Q. And on every date, you signed it?

A. Yes.

Q. Okay. And there's no writing of any kind from you disputing the hours?

A. No. I told her verbally --

Q. Okay.

A. -- she just called me and asked me about patient care. She don't record what the hours I give her. She has not recorded it.

Q. Now, go to the next pink sheet that's underneath what's called 2b. And that starts 2011.

MS. ARORA: Did you go back on the record?

COURT REPORTER: Yes.

MS. ARORA: I think that's what the problem is, is that the way it's fastened, you can't actually see the year.

THE WITNESS: Yeah, 2012.

88

- MARCIA ROBINSON -

MR. STERN: But these are all --

MR. O'BRIAN DELLINGER: 2011.

MS. ARORA: They're all 2012 now.

MR. STERN: Well, you missed --

MS. ARORA: Oh, did we miss one?

MR. STERN: You missed 2011.

MS. ARORA: Okay. Sorry.

MR. O'BRIAN DELLINGER: You're supposed to be helping here.

MS. ARORA: I know.

By MR. STERN:

Q. So I'm going to ask you the same questions with respect to --

A. Yeah.

Q. -- 2011. Please, take a moment, look at each of the time slips, and tell me whether every single time slip bears your signature.

A. I never give a photocopy. Some of them --

MS. ARORA: This is a photocopy. So all you need to do is verify that these are your signatures.

A. Yeah, these are my signature. They are my signature. They are my signature.

MR. O'BRIAN DELLINGER: Just go through

22 (Pages 85 to 88)

89

- MARCIA ROBINSON -

1 every one of them. You don't need to answer
2 --
3
4    MS. ARORA:  Yeah, you don't need to
5 answer for each page.
6    MR. STERN:  Shorten it up.
7    A.    They're all my signatures.
8    Q.    So as to every single day you worked in
9 2011 --
10    A.    Yeah.
11    Q.    -- you signed your name next to the hours
12 worked?
13    A.    She gave me out a fill-out thing to sign --
14    Q.    But you signed your name next to the hours
15 worked?
16    A.    Yes.
17    Q.    And if I understand correctly, you didn't give
18 any writings to Orra Wood disputing those hours?
19    A.    No.  She called me and asked me what I did.
20 She did not record what I told her I did, the patient
21 care, she did not record it.
22    Q.    And then we go to 2012, which is underneath
23 Paragraph 2c, and I'd like you to look at all of those
24 time slips.  Skim through them, if you would.  I'm going
25 to ask you the same questions:  Do each of those time

90

- MARCIA ROBINSON -

1
2 slips reflect a week's period of work?
3    A.    Yes.
4    Q.    And do each of those time slips have the total
5 hours worked in the bottom left-hand corner?
6    A.    No.  I worked more hours than this.
7    Q.    Does it have a statement saying "total hours
8 worked"?
9    A.    Yes.
10    Q.    And does it indicate an amount there?
11    A.    Yes.
12    Q.    And isn't it true that according to the time
13 slips --
14    A.    Yes.
15    Q.    -- you never worked more than 40 hours?
16    A.    I worked more than 40 hours --
17    Q.    According to the time slips --
18    A.    Yeah.
19    Q.    -- you never worked more than 40 hours?
20    A.    I worked more than 40 hours, sir.
21    Q.    Go through each and every time slip and show
22 me a week, in which it's recorded, that you worked more
23 than 40 hours?
24    A.    She never records it.
25    Q.    So listen to my question.

91

- MARCIA ROBINSON -

1
2    A.    Yeah.
3    Q.    Is there any time slip --
4    A.    Yeah.
5    Q.    -- in 2010 -- is there any weekly employee
6 sign-in sheet --
7    A.    Yeah.
8    Q.    -- in all of 2010 --
9    A.    Yeah.
10    Q.    -- that shows you working more than 40 hours
11 that week?
12    A.    No.  She did not put it down.
13    Q.    Is there any employee sign-in sheet for all of
14 2011, in any week --
15    A.    Yeah.
16    Q.    -- that shows you working more than 40 hours
17 per week?
18    A.    No.  I don't see that.
19    Q.    Is there any employee sign-in sheet for any
20 week in 2012 --
21    A.    Yeah.
22    Q.    -- that shows you working more than 40 hours
23 per week?
24    A.    No.  She has not recorded it.
25    Q.    And each sign-in sheet --

92

- MARCIA ROBINSON -

1
2    A.    Yeah.
3    Q.    -- represents a weekly period?
4    A.    Yes.
5    Q.    And each sign-in sheet shows the total hours
6 worked in the bottom left-hand corner?
7    A.    Yes.
8    Q.    And each sign-in sheet shows the gross pay --
9    A.    Yes.
10    Q.    -- and the net pay --
11    A.    Yes.
12    Q.    -- and has a reference to a check number?
13    A.    Yes.
14    Q.    And also shows the deductions from your pay?
15    A.    Yes.
16    Q.    And each sign-in sheet, whether it be 2010,
17 2011, 2012 --
18    A.    Yeah.
19    Q.    -- bears your signature corresponding to the
20 day of work?
21    A.    Yes.  But as I say before --
22    Q.    Okay.
23    A.    -- she did not record everything I was --
24    MS. ARORA:  It's just about the document.
25    THE WITNESS:  Yeah.

23 (Pages 89 to 92)

93

- MARCIA ROBINSON -

1
2  A.  She did not record it then.
3  Q.  Okay.  And I don't know if I asked:  Did you
4  have an opportunity to look through the 2012 slips to see
5  if they contained your signature on every single day that
6  you worked in 2012?
7  A.  No, I didn't say nothing.
8  Q.  Well, there was a question.  Does each -- did
9  you have an opportunity to look through each time slip,
10 weekly time slip --
11 A.  Yes.
12 Q.  -- for 2012?
13 A.  Yes.
14 Q.  Does each time slip bear your signature?
15 A.  Yes.
16 Q.  Okay.  And now the very last time slip says
17 week ending 7/2/12, the very last one.  That shows the
18 last date worked as June 18th of -- no, no.  You had it
19 correct -- June 18th, 2012, is the last day you worked;
20 correct?
21 A.  Yes, about that time.
22 Q.  That's the day you were fired?
23 A.  Yes.
24 Q.  Okay.  And that one's not signed by you;
25 correct?

94

- MARCIA ROBINSON -

1
2  A.  No, I didn't sign nothing.
3  Q.  And whose signature is that one; do you know?
4  A.  Renee Berrel.
5  Q.  And were you fired because of a fight you had
6  with Renee Berrel; is that what you were told?
7  A.  Well, no.  She didn't say because of the
8  fight.
9  Q.  Did she give you any reason why you were
10 fired?
11 A.  After I called the police about the situation
12 with Tom Sawyer, him harassing me, and assaulting me, and
13 threatening me, then some of my days were shortening.  And
14 then Renee attackeded (phonetic) me.  It was an attack.  I
15 didn't have no -- I was fighting with her.  And I defended
16 myself, and I had to call the police again because I had a
17 sprained ankle and a contusion in my leg, which I went to
18 the hospital for.  And so my days were slowed down.
19     And then Tom Sawyer came back on the Saturday
20 when I was fired.  And Orra cursed me and said, Get out of
21 here, Girl, you're a thief.
22     She accused me of being a thief.
23 Q.  Did she tell you what she thought you had
24 stolen?
25 A.  No.  And I left immediately, and I came back

95

- MARCIA ROBINSON -

1
2  for my things.  And I told her she could go through my
3  bags before I leave, and she didn't go through them.
4  Q.  Would you turn to the exhibit -- as part of
5  Exhibit C there's a section called Paragraph 2k.  It's a
6  pink sheet.
7      MS. ARORA:  These pink sheets are not
8  numbered after a while.  Oh, here we go.
9  Q.  Okay.  So what I'm showing you now --
10 A.  Yeah.
11 Q.  -- is photocopies of checks --
12 A.  Yeah.
13 Q.  -- that are payable to Marcia Robinson.
14 A.  Yes.
15 Q.  And the first check starts 12/13/2010.  Do you
16 see that?
17 A.  Yes.
18 Q.  I'd like you to look through the checks --
19 A.  Yeah.
20 Q.  -- and tell me whether these are payroll
21 checks you received from Orra Wood for 2010, 2011, and
22 2012.
23 A.  They're all personal checks.
24 Q.  What do you mean when you say "personal
25 checks"?

96

- MARCIA ROBINSON -

1
2  A.  Personal check that it's not the payrollee
3  (phonetic).  It's not an official payrollee check.  She
4  wrote them herself.
5  Q.  Doesn't it say "Wood Farm" on it?
6  A.  Yes.
7  Q.  Isn't that the employer, Wood Farm?
8  A.  But I don't do farming.
9  Q.  I understand.  That was the name of the
10 business, wasn't it?
11 A.  Adult Daycare.  It didn't have Wood Farm.
12 Adult Daycare.
13 Q.  The name of the business was Adult Daycare?
14 A.  Yes.
15 Q.  Is wasn't Wood?
16 A.  Farm, she didn't -- I didn't see Wood Farm in
17 the advertisement.  Adult Wood.
18 Q.  Okay.  You received the checks, didn't you?
19 A.  Yes, I received checks.
20 Q.  You cashed the checks, didn't you?
21 A.  Yes.
22 Q.  It didn't matter to you whether it was a
23 personal check or a check that said Adult Daycare on it?
24 A.  Well, that's her policy of paying me, and I
25 had to accept it at that point.

24  (Pages 93 to 96)

**97**

- MARCIA ROBINSON -

1
2  Q.   So you feel there was something wrong in the
3  check that you received?
4  A.   Yes, I did.
5  Q.   And what is it that you feel that was wrong in
6  the check that you received?
7  A.   The check was incorrect, because I worked more
8  hours, from 6:00 in the morning and the job was constant.
9  And she know.  She called me in the morning for a report.
10  And for me to give a report, I had to be up with them at a
11  certain amount of hours, and it passed the hours that I
12  signed for on the time sheet.  So she was aware I was
13  working.
14  Q.   Now, looking at the dates on the checks.
15  A.   Yes.
16  Q.   Did you receive a paycheck every week?
17  A.   Yes.
18  Q.   Did you receive a paycheck at the same time
19  that the other employees received their paycheck?
20  A.   Yes.
21  Q.   And looking at the paychecks that are in front
22  of you --
23  A.   Yeah.
24  Q.   -- does each paycheck or did each paycheck
25  indicate on it the withholding for social security,

**98**

- MARCIA ROBINSON -

1
2  Medicare, federal tax, and state tax?
3  A.   Yes.
4  Q.   So if I understand you correctly, your problem
5  with the checks is that it wasn't for the correct amount,
6  because you worked -- you claimed to have worked more
7  hours than what you were paid for?
8  A.   Yes.  Because she told me to watch over the
9  patient.  She called me about their condition.  She called
10  me about their condition in the morning, and it was past
11  the hours that I had -- she asked me to sign.
12  Q.   Okay.  So, Ms. Robinson, so in 2010 --
13  A.   Yes.
14  Q.   -- you worked there from August?
15  A.   Yes.
16  Q.   September?
17  A.   Yes.
18  Q.   October?
19  A.   Yes.
20  Q.   November?
21  A.   Yes.
22  Q.   And December?
23  A.   Yes.
24  Q.   That's almost 5 months.
25  A.   Yes, sir.

**99**

- MARCIA ROBINSON -

1
2  Q.   During which time, if I understand you
3  correctly --
4  A.   Yeah.
5  Q.   -- you worked from 6 in the morning --
6  A.   Yeah.
7  Q.   -- to 10 at night every day?
8  A.   Every day.  Immediately.
9  Q.   Every day, 5 days a week?
10  A.   Immediately when I started the assignment.
11  Q.   5 days per week; correct?
12  A.   Yes.
13  Q.   And yet, you were never paid for more than
14  40 hours per week.
15  A.   Less than 40 hours on the time, yes.
16  Q.   And during that 5 months --
17  A.   Yes.
18  Q.   -- did you make any claims with any
19  department?
20  A.   No, I did not.  Because she told --
21  Q.   You knew who to make claims to, correct, you
22  made claimants in the past --
23  A.   Yes.
24  Q.   -- to unemployment and to different agencies?
25  A.   Yes.

**100**

- MARCIA ROBINSON -

1
2  Q.   But you made no claim against Orra Wood for
3  that 5-month period?
4  A.   I spoke with her --
5  Q.   Yes or no:  You made no claim against her?
6  A.   Yes, I spoke with her --
7  Q.   Did you make any claim against her?
8  A.   No.
9  Q.   Okay.  And you gave nothing in writing
10  protesting the fact that you were only being paid for less
11  than 40 hours?
12  A.   No.  Nothing in writing.  But she --
13  Q.   Nothing in writing.  So now we go to 2011.
14  A.   Yeah.
15  Q.   And you worked there --
16  A.   Yes.
17  Q.   -- from January through December in 2011?
18  A.   Yes.
19  Q.   12 months?
20  A.   Yes.
21  Q.   During which time you were never paid for more
22  than 40 hours a week?
23  A.   Yeah, less than 40 hours a week.
24  Q.   Less than 40 hours per week?
25  A.   Yes.

25 (Pages 97 to 100)

101

- MARCIA ROBINSON -

1
2      Q.   And during which time, you're working from 6
3   in the morning --
4      A.   Yeah.
5      Q.   -- until 10 at night?
6      A.   Yeah.
7      Q.   5 days a week?
8      A.   Yes.
9      Q.   More than 40 hours?
10     A.   Yes, sir.
11     Q.   In fact, according to your complaint here --
12     A.   Yes.
13     Q.   -- you claim that you regularly worked 80
14   hours a week; correct?
15     A.   Yes.
16     Q.   And so for 12 months --
17     A.   Yes.
18     Q.   -- you regularly worked 80 hours a week?
19     A.   Yes.  She knew I was.
20     Q.   Let me finish.  And you made no claim --
21     A.   Yes.
22     Q.   -- against Orra Wood for the fact that she was
23   underpaying you?
24     A.   No, I didn't make no claim.
25     Q.   And you gave nothing in writing to Orra Wood

103

- MARCIA ROBINSON -

1
2   during that period of time?
3      A.   No.
4      Q.   And it's not until you're fired --
5      A.   Yeah.
6      Q.   -- by Orra Wood --
7      A.   Yes.
8      Q.   -- that you first make a claim against her?
9      A.   Yes.
10          (Discussion held off the record.  Whereupon,
11          following which, these further proceedings
12          transpired.)
13   BY MR. STERN:
14     Q.   And in 2012, also, in addition to making no
15   claims, you gave no writing to Orra Wood disputing the
16   hours you were working.
17     A.   After I was fired, I contacted the place to
18   make a claim for what I have.  Because when I told her
19   what I was doing at night and what I did, and she called
20   me about patient care, she did not record it, and I could
21   not --
22     Q.   My question is:  While you were working for
23   her --
24     A.   Yeah.
25     Q.   -- you didn't put anything in writing

102

- MARCIA ROBINSON -

1
2   disputing the hours that you claim to have been working?
3      A.   It was verbally.  And she said that's what it
4   is.
5      Q.   So my question is:  You gave her nothing in
6   writing disputing the hours you were working.
7      A.   It wasn't in writing.
8      Q.   And then we go to 2012.
9      A.   Yeah.
10     Q.   And you worked from January to June, which is
11   6 months.
12     A.   Yeah.
13     Q.   And another 6 months goes by, and, again,
14   you're working 5 days a week?
15     A.   Yeah.
16     Q.   From 6 in the morning --
17     A.   Yeah.
18     Q.   -- until 10 at night?
19     A.   Yes.
20     Q.   And you're never being paid for more than 40
21   hours per week?
22     A.   I was --
23     Q.   Always less than 40 hours; correct?
24     A.   Yes.
25     Q.   And you make no claims against Orra Wood

104

- MARCIA ROBINSON -

1
2   disputing the hours --
3      A.   No.
4      Q.   -- that you were working?
5      A.   No.
6          THE WITNESS:  Can I answer another
7          question?
8          MS. ARORA:  There was no question asked.
9          (Discussion held off the record.  Whereupon,
10          following which, these further proceedings
11          transpired.)
12   BY MR. STERN:
13     Q.   Let me show you what's been marked as Exhibit
14   D for identification.  And I'll tell you that this is the
15   documents that was produced to me by your attorney on
16   August 10th, 2014.
17     A.   Yeah.
18     Q.   Please take a look at them.
19     A.   (Witness perusing documents.)
20     Q.   All right.  Did you provide the materials that
21   make up Exhibit D to your attorney?
22     A.   Yes.
23     Q.   Okay.  And there are -- the papers are
24   numbered, are they not?
25     A.   Yes.

26 (Pages 101 to 104)

105

- MARCIA ROBINSON -

1
2    Q.   And there's pages 1 through 20?
3    A.   Yes.
4    Q.   Okay. Let's go to page 2.
5    A.   Yes.
6    Q.   Can you tell me what this is?
7    A.   Page 2?
8    Q.   Yeah.
9    A.   Hours worked with the patient.
10   Q.   What is the document?
11   A.   It is a -- it's to record the hours, the work
12   that you do for the patient. When I talk -- call -- when
13   she called up in the morning and asked me: How was the
14   patient? What happened? I told her over the phone, she
15   wasn't paying me right. So I said I have to start writing
16   down what I do. And this is what I do for Mary.
17   Q.   Where did you get this form?
18   A.   I got it in her cabinet.
19   Q.   Did Orra Wood give you this form?
20   A.   No, she didn't give it to me. But it's
21   patient form.
22   Q.   So you entered her cabinet, and you took the
23   form?
24   A.   I always enter the cabinet for medication.
25   And the form was there, and I fill out what I'm doing for

106

- MARCIA ROBINSON -

1
2    the patient.
3    Q.   Did you tell -- withdrawn.
4         Did you ask Orra Wood if you could take this
5    form?
6    A.   No, I did not.
7    Q.   After you took the form, did you tell Orra
8    Wood that you had taken the form?
9    A.   No, I didn't tell her I take the form. But
10   she called me in the morning what I'm doing for the
11   patient. And this is how I get to write down what I'm
12   doing.
13   Q.   Did you turn this form in to Orra Wood at any
14   time prior to being fired?
15   A.   No. She called me. I write it down and tell
16   her what I'm doing with the patient.
17   Q.   So did you make the entries on this form at
18   the time of the dates shown?
19   A.   Well, that's most possible.
20   Q.   I mean, the very first entry here is August of
21   2010. I can't read the date, but it's August, something,
22   2010.
23   A.   Yeah. I write down because I got to tell her
24   what I'm doing. I'm reporting to her. She calls me in
25   the morning.

107

- MARCIA ROBINSON -

1
2    Q.   So --
3    A.   And she normally call me. So when I see this
4    paper, I say let me just start document it. And that's
5    what I did.
6    Q.   But you never gave her this form?
7    A.   No, because I telephone her. She don't want
8    it. I telephone her.
9    Q.   You never gave her the form and you never told
10   her you took the form from her cabinet?
11   A.   No, I don't tell her.
12   Q.   She didn't ask you to complete this form, did
13   she?
14   A.   No. But I did it because she asked what I'm
15   doing.
16   Q.   And all of the entries that were made on
17   here --
18   A.   Yes.
19   Q.   -- is this in your handwriting?
20   A.   It's my handwriting and Orra Wood's aware.
21   Q.   And none of these entries were made at Orra
22   Wood's request?
23   A.   She asked me. Because she said -- yes, it's
24   at her request. She said -- yes, she asked me to -- at
25   night, to look out for the patient. And she -- there were

108

- MARCIA ROBINSON -

1
2    nobody else there to assist me.
3    Q.   Why didn't you give the completed form to Orra
4    Wood?
5    A.   She does not want it. She does the hours
6    herself.
7    Q.   Well, she didn't know you were completing
8    this; you didn't tell her.
9    A.   Well, she asked me to over the phone.
10   Q.   Did she ask you to complete this form?
11   A.   No, she did not. But I had to write it down,
12   because she was not paying me right, so I document what I
13   was doing.
14   Q.   So you wrote down on this form that you
15   started at 6 in the morning --
16   A.   Yes, sir.
17   Q.   -- on August 10th.
18   A.   Yes.
19   Q.   And you worked until, looks like here like 7 a.m.
20   A.   Yes.
21   Q.   And then it says 9 to 10:30.
22   A.   Yes.
23   Q.   And then there's nothing there until 12:30.
24   Does that mean you were off from 10:30 to 12:30?
25   A.   If it's p.m., it mean that I take a break.

27 (Pages 105 to 108)



Hudson River Health Care
29 N Hamilton ST
Poughkeepsie, NY 12601
Phone: 845-454-8204
Fax:845-452-6549 or 845-454-8247

## Consent for Release/Request for Confidential Information

Patient Name: _Marcia Robinson_

Address: _____  Date of Birth: _May 7 1964_

Telephone Number: _860 322-9761_  Date of Request: _3/29/16_

I authorize HRHCare to disclose to: _52 Washington Ave Stey_

_North Haven CT 06433_

Phone _(203) 672-9800_

Attn: _Receptionist_

I authorize _Main Medical_ to disclose for HRHCare Attn: _Victoria_

Information to be released or received: _at Doctor Office_

(Date of Treatment): _____

_____

Purpose of Disclosure:   (Continuing Medical Care)       Insurance Processing

Legal                Other (Please specify) _____

Indicate below if you authorize disclosure of medical records that may include treatment pertaining to:

Psychiatric Conditions (requires separate release of information form completed)

Alcohol or Substance Abuse conditions (requires a separate release of info form completed)

Acquired Immunedeficiency Syndrome (AIDS) or test for infection with human
Immunodeficiency syndrome (HIV) (Requires a separate release of information form completed)

I understand my records are protected under federal regulations governing confidentiality of alcohol and drug abuse patient
records. Title 42 CFR part 2, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Title 45 CFR Parts 160
and 164 and New York State Law governing the confidentiality of all HIV information, Article 27-F of the Public Health Law, and
Chaper 584, can not be disclosed without my written consent unless otherwise authorized in the regulations.

I may revoke this authorization at any time by a written notice except that such action has been taken in reliance on it. The
authorization shall automatically expire six (6) months from the date of request unless a specific date, event or condition upon
which this consent expires is indicated below:

_____

I understand the generally Hudson River Health care may not condition my treatment on whether I sign a consent form, but that in
certain limited circumstances I may be denied treatment if I do not sign a consent form.

_M. Robinson_                    _3/29/16_              _None_
Signature                        Date                   Relationship to Patient

_____         _8/29/16_
Witness                          Date

## REDISCLOSURE OF MEDICAL INFORMATION IS PROHIBITED BY LAW

# RENTAL AGREEMENT

| PREMISES | TERM OF LEASE | | |
|---|---|---|---|
| PROPERTY NAME:<br>**PREFERRED HARTFORD PROPERTIES, LLC.**<br><br>**SYLVIA**<br><br>ADDRESS    862 Asylum Avenue B5<br>HARTFORD, CT  06105 | NUMBER OF MONTHS:  **12 Months** | | |
| | BEGINNING: 12/01/2013 | | |
| | ENDING:     11/30/2014 | | |
| DATE: 12/02/2013 | SECURITY | | |
| | SECURITY DEPOSIT: | | $ 825.00 |
| | APARTMENT KEY DEPOSIT: | | $ 75.00 |
| | GARAGE KEY DEPOSIT | | $ 0.00 |
| **PARTIES TO THE AGREEMENT** | MONTHLY RENTAL<br>CHARGES | | |
| **LANDLORD:**<br>**PREFERRED HARTFORD PROPERTIES.LLC**<br>P.O. BOX 9005<br>MT.  VERNON, NY 10552<br>(914)668-0195 NY Office<br>(860)549-3181 Hartford Office | BASIC RENT | | $ 550.00 |
| | NO PARKING | | $ 0.00 |
| | TOTAL RENT PER MONTH | | $550.00 |
| | TOTAL RENT FOR LEASE TERM | | $ 6,600.00 |
| **TENANT-LESSEE:**<br>Marcia Robinson | | | |
| NUMBER OF OCCUPANTS: 1 | | | |
| NAMES OF OCCUPANTS:<br>Marcia Robinson | | | |

1. Tenant will pay the above stated rent on or before the first day of each month without demand at the Landlord's place of business as stated above or at such other place as shall be designated by the Landlord in writing.  A late charge of $50.00 will be incurred as additional rent for rent payments received after the tenth (10th) of the month.  A charge of $75.00 will be incurred as .additional rent for each check tendered in payment of Tenant's obligation which is returned by the bank unpaid for any reason.

2. Security will be held and retained by Landlord according to law for the performance by Tenant of his duties and payments pursuant to this Lease, and the applicable Regulations.  Under no circumstances may the Tenant apply the security to rental payments. In the event that the tenant decides to vacate the apartment before the lease expiration date, the security deposit will not be returned to tenant. Also the tenant can be liable for the remaining term of the lease payable to landlord.

3. Tenant agrees that execution of this Lease by Landlord is not a waiver of any past due sums due Landlord for prior defaults or damages of Tenant which shall continue to be due as additional rent.

4. All sums paid by Tenant for rent or damages shall be applied first to the earliest obligations due Landlord.

5. The Landlord leases to the Tenant the above described dwelling unit for use as a private dwelling unit to be occupied by the above named occupants only.  If any person other than the occupants listed on the rental agreement live in the apartment for more than fifteen (15) days and we decide not to cancel this rental agreement, you agree to pay us additional rent of $100.00 for each additional person per month.

28.  Tenant agrees this Rental Agreement is subject to and subordinated to all liens, mortgages and master leases now or hereafter placed on the property.

29.  Any property of the Tenant left in the dwelling unit or on the premises at the expiration of the lease term or upon the Tenant's eviction or vacating the premises shall be deemed abandoned and the Landlord shall have the right to dispose of said property without responsibility or liability and charge the tenant full cost for disposing said property.

30. No representation, statement or warranty, express or implied, has been made by or on behalf of the Landlord as to the condition of the dwelling unit or premises or of the use thereof except as contained in this Rental Agreement. The Tenant has inspected the dwelling unit premises and acceptance thereof is based on such inspection.

31.  All notices pursuant to this Rental Agreement must be in writing to the person who signed this Rental Agreement as agent for the Landlord, which person is the Landlord's authorized agent, at the Landlord's address as set forth herein.  All notices, demands and services of process shall be directed to that address unless otherwise changed by the Landlord's Agent in writing.

32.  The entire agreement between the parties is contained herein and in the Regulations.  Modification of this Rental Agreement can be by written instrument only, signed by the Landlord and Tenant.  Modification of the Rules and Regulations by the Landlord shall be in writing with reasonable notice to the Tenant.

33.  If any provision of this Rental Agreement is declared invalid or unenforceable, the remainder of the Rental Agreement shall continue in full force and effect.

34.  Whenever the words lease, lease agreement or other words of similar import referring to this agreement are used herein they mean Rental Agreement. The words lease term, lease period or other words of similar import whenever used herein mean the rental term covered by this Rental Agreement.

Landlord
**Preferred Hartford Properties, LLC**

By:

Agent for Landlord

Tenant

_____
Witness to Tenant

_____
Witness to Tenant

_____
Tenant

# ETHAN ALLEN PERSONNEL GROUP, INC.
## dba Ethan Allen Staffing
### 59 Academy Street
### Poughkeepsie, NY 12601

February 8, 2016

Marcia Robinson-Humber
Apt 8C
20 North Bridge
Poughkeepsie, NY 12601

Re: Employment through Ethan Allen Staffing

Our records indicate that you were employed through Ethan Allen Staffing on several temporary, per diem assignments as a Direct Care Worker during the period 06/06/09 to 05/26/10.

Should you have any questions, please contact me directly @ 845-471-9667 X356.

Nancy Tolman
Payroll Department
Ethan Allen Staffing
59 Academy Street
Poughkeepsie, NY 12601
(845) 471-9667 X356

# NOTICE TO QUIT (END) POSSESSION

JD-HM-7 Rev. 1-11 C.G.S. § 47a-23

### Instructions To Landlord

1. Fill out this notice and give it to a state marshal or any proper officer with enough copies for each adult occupant and tenant you want to evict.

2. After service (delivery to the tenant(s) and occupant(s)) is made, the original Notice to Quit will be returned to you. If you do not want to include your address on this form, give this information to the marshal or other proper officer on a separate sheet so that the officer can return the original notice to you promptly after making service.

www.jud.ct.gov

To: Name(s) of tenant(s) and occupant(s)

**Marcia Robinson**

Address of premises, including apartment number, if any

**862 Asylum Avenue, Apt#B5, Hartford, CT 06105**

You must quit (end) possession or occupancy of the premises described above and now occupied by you on or before ___June 9, 2014___ for the following reason(s) (specify):

(Date)

**NON PAYMENT OF RENT**

ATTEST:
A TRUE COPY

JOSEPH MUSUMECI
CONNECTICUT MARSHAL
HARTFORD COUNTY

If you have not moved out of the premises by the date indicated above, an eviction (summary process case) may be started against you.

| Name of landlord (Print or type) | Signed (Landlord/Attorney) |
|---|---|
| **Preferred Hartford Properties** | |
| Dated at (Town) | On (Date) |
| **Hartford** | **6/3/2014** |
| Address of landlord  (Submit to proper officer on a separate sheet if desired) | |
| 1021 Asylum Avenue, Suite #100, Hartford, CT 06105 | |

## Return Of Service (To be completed by officer who serves (delivers) this notice)

| Service made at (Address) | On  (Date of service) |
|---|---|
| | |
| | **Fees** |
| | Copy |
| Then and there I made due and legal service of the foregoing notice by leaving a true and attested copy (copies) with or at the place where each of the tenant(s) and occupant(s) named above usually live. | Endorsement |
| | Service |
| | Travel |
| Attest (Name and title) | Total |

NOTICE TO QUIT (END) POSSESSION

Print Form          Reset Form



Mental Health America
of Dutchess County

March 21, 2016

To Whom It May Concern,

This letter is to confirm that Marcia Robinson was a client of the Living Room
Program, Mel's Place, which is a homeless day shelter, in the years 2008-2009.
She also used the overnight services at Hillcrest House.

Sincerely,

Vernae Johnson
Program Manager
Homeless and MICA Services